# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   20-sw-00717-GPG |
| 2003 green Jeep Liberty, Bearing Colorado License Plate CTC603, VIN: 1J4GL48K23W529500 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____ State and _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Controlled Substances; |
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possession with Intent to Distribute Controlled Substances. |

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Jason Greenfield
_____
*Applicant's signature*

Jason Greenfield, Specal Agent
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   6/17/20
_____

City and state:   Grand Junction, Colorado
_____

_____
*Judge's signature*

Gordon P. Gallagher - Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR THE SEARCH OF A 2003 GREEN JEEP LIBERTY
WITH COLORADO LICENSE PLATE CTC603
ASSIGNED VEHICLE IDENTIFICATION NUMBER
1J4GL48K23W529500

---

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

---

## INTRODUCTION

I, Jason Greenfield, a Special Agent ("SA") with the Drug Enforcement

Administration ("DEA") assigned to the Grand Junction Resident Office of the Denver

Field Division, being duly sworn, deposes and states as follows:

1.      Based on the facts set forth below, I believe that probable cause exists to

search a 2003 green Jeep Liberty, with Colorado license plate CTC603, assigned

Vehicle Identification Number ("VIN") 1J4GL48K23W529500 (fully described in

Attachment A.), registered to Tony Duane Harris, at 1242 7745 Rd, Crawford, CO

81415, currently secured at the Montrose County Sheriff's Office impound facility

(hereinafter the "TARGET VEHICLE" and thereupon to seize items (fully described in

Attachment B.), which constitute: (1) evidence of a crime; (2) contraband, fruits of a

crime, or other items illegally possessed, and (3) property designed for use, intended for

use, or used in committing a crime.  I state that the vehicle to be searched and the items

to be seized relate to the following federal offenses:

        a.      Title 21, United States Code, Section 841(a)(1), Distribution and

        Possession with Intent to Distribute Controlled Substances;

1

       b.      Title 21, United States Code, Section 846, Conspiracy to Distribute and Possession with Intent to Distribute Controlled Substances.

## BACKGROUND OF THE AFFIANT

       2.      I am a Special Agent with the DEA, United States Department of Justice, and as such I am empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants.  I have been employed as a DEA Special Agent for approximately 14 years.  In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances.  During my time with DEA, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code.  I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

       3.      Based on my training and experience, I know that it is generally a common practice for people who traffic in large amounts of controlled substances to keep records, proceeds from drug transactions, and other evidence.  I know that records, in particular, are often maintained by drug traffickers.  These records include pay-owe sheets or notations.  Evidence of such records are typically maintained and found within

2

camps, upon the premises owned or controlled by the drug trafficker, upon their persons, or within vehicles they use, and are of evidentiary value.

4.      Based on my training and experience, I know that persons who distribute drugs use miscellaneous written documents such as published books and magazines concerning drug manufacturing and sales, written records concerning the perpetrator's distribution activities, account ledgers dealing with profits and losses associated with growing and distributing drugs, distribution schedules, documents concerning profitability, and other such documents and written records.  These written records and documents are normally discovered during the execution of a search warrant upon the residence or location, the premises owned or controlled by the distributor, upon their persons, or within vehicles they use, and are of evidentiary value.  I also know that traffickers often use wire transfers, cashier's checks, and money orders to pay for controlled substances or transfer proceeds.  Evidence of such financial transactions and records relating to income and expenditures in connection with drug trafficking are typically maintained and found upon the premises owned or controlled by the traffickers, upon their persons, or within vehicles they use, and are of evidentiary value.  During investigations of drug distribution to include but not limited to methamphetamine, marijuana, cocaine, and heroin, agents have found written documents, including, but not limited to, pay-owe sheets, lists of phone numbers (including numbers of potential co-conspirators), records of drug distribution, lists of associates (including names of potential co-conspirators), and identification documents such as driver's licenses, state identification cards, credit cards, school identification, social security cards, and voter registration cards.

5.      Based on my training and experience, I know drug traffickers typically possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might want to forcibly take the traffickers' profits and/or supply of drugs.

6.      Based on my training and experience, I know that drug traffickers seeking to avoid detection of their illegal narcotics, weapons, and/or large amounts of currency, frequently hide these items in their residences, vehicles, garages, storage buildings, unused recreational vehicles, travel trailers, or other unused vehicles parked on their property or at their residences and in, under, or behind camping equipment, yard furniture, buildings, plants, trees, rocks, trash containers, and other items located within or near their residences.

7.      My awareness of these drug trafficking practices, as well as my knowledge of drug manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:

      a.      my training in controlled substance investigations;

      b.      my past experience in the investigation of drug distribution organizations;

      c.      the experience of other officers and agents who have trained and advised me; and

      d.      other information provided through law enforcement channels such as databases.

8.      Based on information set forth below, I believe probable cause exists to believe that currently within the TARGET VEHICLE are items relating to violations of

Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to distribute and possess with the intent to distribute Controlled Substances.

## **PROBABLE CAUSE**

9.      On March 3, 2020, the Seventh Judicial District Drug Task Force (SJDDTF) conducted a controlled purchase operation (CPO) utilizing a confidential source ("CS").

   a.      The CS was working with the SJDDTF for judicial consideration related to drug trafficking activities the CS was involved in arising out of a separate investigation. The CS's criminal history includes arrests for fraud, arson, bail bond violation, theft, and possession of schedule II controlled substance. To law enforcement's knowledge the CS has not knowingly provided any false information regarding LIVERMORE, SCHMID or their associates.

   b.      On March 3, 2020, the CS was in contact with Adam LIVERMORE. LIVERMORE agreed to sell the CS two ounces of methamphetamine in exchange for $700.  Prior to the CPO, SA Sean Flanagan observed a black sedan pull up to the residence where the CPO was going to take place.  SA Flanagan observed two individuals exit the vehicle and walk into a garage, separate from the main residence.  Thereafter, the CS arrived at the location, exiting his/her vehicle.  The two individuals met with the CS and they all entered the residence.  The CS later confirmed the two individuals were Adam LIVERMORE and Angela SCHMID.  SCHMID left a short time later, prior to the actual controlled purchase.  SA Neff was able to obtain a license plate for the

vehicle SCHMID left in, Colorado GOW-791 which came back registered to Angela SCHMID.

      c.      During the controlled purchase, LIVERMORE provided the CS with two ounces (56 grams) of methamphetamine in exchange for $700.  During the post buy debrief with the CS, he/she said LIVERMORE had obtained a backpack from the passenger seat of SCHMID's vehicle.  The confidential source said the backpack contained the methamphetamine.

10.     Later, based on a separate incident, a state warrant was issued for LIVERMORE related to drug trafficking and firearms offenses.  During this incident LIVERMORE was in possession of a significant quantity of methamphetamine and a loaded handgun.

11.     On May 21, 2020, SCHMID and LIVERMORE were arrested on state charges.

      a.      On that date, SJDDTF Agent Chance Davidson observed a black Pontiac sedan matching the description of the vehicle SCHMID used to drive LIVERMORE to the CPO.  As Agent Davidson passed the vehicle, he was able to immediately identify the driver Angela SCHMID.  Agent Davidson is very familiar with SCHMID, as she was involved in a prior federal drug investigation. Agent Davidson also knew SCHMID was currently out on Federal Pre-Trial Supervision and was associated with LIVERMORE, for whom Agent Davidson knew there was an active arrest warrant.  Agent Davidson had also been informed by a confidential source that SCHMID and LIVERMORE were together and LIVERMORE was now living with SCHMID in Somerset, Colorado.  Agent

Davidson and I know based on prior involvements with SCHMID that her main residence is located in Somerset, Colorado.

      b.      Believing LIVERMORE may be in the vehicle with SCHMID, Agent Davidson reduced his speed, hoping SCHMID would pass.  SCHMID entered into the acceleration lane and began to pass.  Agent Davidson attempted to look into the front passenger window, but due to dark window tint was unable to see in.  As the car continued passing, Agent Davidson could tell the front passenger seat was laid all the way back and was not upright like the front driver seat. Agent Davidson could see SCHMID through the back window looking towards the front passenger seat, laughing, making it appear as if someone was in the front passenger seat.  Based on his prior knowledge and the circumstances he observed, Agent Davidson believed that SCHMID was travelling with Adam LIVERMORE, and that they were attempting to prevent LIVERMORE's detection and arrest.

      c.      Agent Davidson continued following the vehicle, until it reached the intersection of Highway 50 and North River Road, Olathe, Colorado.  At that point, SCHMID turned down North River Road and began traveling southbound, while Agent Davidson continued south on Highway 50 and turned to intercept them.  As Agent Davidson passed the vehicle, it made a turn and pulled up to some onion cellars.  Another agent aired via radio that the car pulled up to the onion shed closest to Highway 50.  The agents then set up in the area waiting for the vehicle to leave.  Shortly thereafter, they drove back by, but did not see the black Pontiac.

       d.      Agents maintained surveillance of the onion cellars, while contacting other law enforcement for assistance with attempting to apprehend LIVERMORE, who officers considered armed and dangerous.  While waiting, agents observed SCHMID come out from the east side of the onion cellar and throw some trash into a bin outside.  SCHMID walked towards a white garage door and went inside, shutting the door behind her.  Moments later, agents observed the white garage door open and the black Pontiac sedan begin backing out.  Agents proceeded to drive in behind the black Pontiac sedan to prevent it from fleeing.  As Agent Davidson pulled to the rear of the vehicle, he saw SCHMID exit the front driver seat of the vehicle and run back inside the onion cellar and proceed to shut the garage door again. Officers began yelling and giving verbal commands to SCHMID to come back outside.  SCHMID did not comply.  Instead, agents observed the garage door raising up and down and could hear SCHMID yelling about something, but could not make out what she was saying.  An officer began loud hailing over the patrol vehicle's intercom, instructing SCHMID to call into dispatch and advise them of what was going on. Shortly after, dispatch aired via radio that SCHMID had called in and claimed the garage door was wedged and wouldn't open.  SCHMID was instructed to exit the east door of the onion cellar.  Officers went to the east side of the onion cellar and made contact with SCHMID, where she was detained.  SCHMID was in possession of a considerable amount of cash when she was detained.  Both the cash and her cell phone were seized at that time.

e.      Officers continued giving orders to LIVERMORE to exit the onion cellar, but he did not comply.  When questioned, SCHMID claimed LIVERMORE was not inside the onion cellar.  SCHMID maintained in this deception despite being advised that there was a warrant for LIVERMORE's arrest and that lying about his whereabouts could be charged as a criminal offense.  Approximately an hour later the Montrose County Street Crimes Unit arrived on scene to assist. Officers began devising a plan for the utilization of the SWAT team.

f.      Sometime later, agents made their way to the east side of the onion cellars.  While walking towards the door, Agent Davidson observed something moving on the south side of the door.  Shortly after, Agent Davidson could see the object moving was a foot.  Agents began giving verbal commands to the individual to show their hands. Agents made their way around the structure of the door and positively identified the male party as LIVERMORE.  LIVERMORE was then placed into custody on the outstanding warrant.

g.      A search was conducted of LIVERMORE prior to being placed inside a marked patrol unit.  A large amount of cash was found on LIVERMORE's person.  LIVERMORE told Special Agent Neff that he had roughly $8,000 in cash.

h.      Agent Davidson attempting to interview LIVERMORE after advising him of his *Miranda* rights.  LIVERMORE agreed to speak with Agent Davidson and stated that SCHMID didn't deserve to get in trouble and he would take responsibility for everything.  Agent Davidson explained to LIVERMORE that SCHMID was being charged and transported to the jail.  Agent Davidson asked

LIVERMORE how much cash he believed he had, he said somewhere between $6000 to $8000.  LIVERMORE couldn't explain why he had that much cash on him.  Agent Davidson asked LIVERMORE if he would like to go sit down and talk more in depth about what happened.  LIVERMORE said he would own what he did, but didn't want SCHMID getting into trouble.  Agent Davidson concluded the conversation with LIVERMORE.

       i.       Based on SCHMID and LIVERMORE's criminal history and recent involvement with illegal narcotics, Agent Davidson requested a drug detection canine arrive on scene and conduct a free air sniff of the outside of the black Pontiac sedan; the canine alerted on the vehicle.  A search was then conducted of the black Pontiac sedan. Agent Davidson opened the driver's door and observed a green purse sitting on the floor board.  He retrieved the purse and sat it on the hood of the vehicle.  Inside, Agent Davidson discovered two additional cell phones, a digital camera, and vehicle registrations and titles, including a title indicating SCHMID and LIVERMORE jointly owned a vehicle.  SA Neff searched the back seat where he located a black HP laptop, a black binder containing potentially relevant documents intermingled with documents pertaining to SCHMID's ongoing federal prosecution and two notebooks (possible ledgers). At the completion of the search, exit photographs were taken and all the vehicle doors were locked. The keys were placed into SCHMID's property.  No controlled substances were located in the vehicle, but I would note that the structure and surrounding area were not searched.

j.      Following this incident SCHMID was charged with multiple state offenses, including a felony for accessory to a crime.  Thereafter, a federal warrant was issued for SCHMID's arrest based on numerous bond violations.

k.      A state search warrant was later sought and obtained for the devices seized during this incident.  Execution of that warrant remains pending.

l.      The currency in LIVERMORE's and SCHMID's possession was transported to the Drug Task Force office and placed into evidence for safekeeping.  A few days later, a drug canine was utilized on the currency.  The currency seized from LIVERMORE and the currency seized from SCHMID were separately placed in locations not known to the canine or his handler.  The canine did not alert to the currency that was in LIVERMORE's possession, but did alert to the currency possessed by SCHMID, indicating the presence of the odor of controlled substances.

12.     On May 27, 2020, officers conducted an interview with a source of information (SOI). The SOI identified LIVERMORE and SCHMID as distributors of methamphetamine.  The SOI stated he/she had been purchasing methamphetamine from LIVERMORE.  The SOI explained that LIVERMORE and SCHMID routinely have ten (10) pounds of methamphetamine on hand and they store the methamphetamine in Somerset, Colorado, or in Olathe, Colorado at the onion sheds near the intersection of Carnation Road and Highway 50.  The SOI stated LIVERMORE and SCHMID are obtaining the methamphetamine from Arizona.

13.     On June 12, 2020, law enforcement established surveillance around the area of 3941 HWY 133 Somerset, CO, believing that SCHMID, who had an active

federal warrant, was living at this location.  A short time after establishing surveillance,

DEA SA Flanagan observed Adam LIVERMORE in front of the residence.  Agent

Davidson observed a female he positively identified as Angela SCHMID at the

residence as well.  Agents also observed a green Jeep (the TARGET VEHICLE) at the

residence.

14.     A short time later, surveillance observed the green Jeep driving

westbound on the highway.  The vehicle had two occupants at this time, a male driver

identified as LIVERMORE by SA Flanagan, and an unknown passenger.  The green

Jeep was seen entering a driveway on the north side of the highway.  Approximately

two minutes later, the green Jeep departed the driveway again heading westbound on

the highway.  However, the driver now appeared to be a female (later identified as

SCHMID).  A Colorado State Patrol trooper in a marked patrol vehicle initiated a traffic

stop on the TARGET VEHICLE for traveling 72 in a posted 55 mile per hour zone.  The

trooper activated his overhead lights in an attempt to stop the vehicle.  At that point, the

trooper observed the vehicle brake and turn suddenly onto the shoulder.

15.     LIVERMORE exited the vehicle.  The trooper issued several verbal

commands to LIVERMORE, which LIVERMORE did not initially follow.  Although

LIVERMORE eventually complied, based on LIVERMORE's actions, the trooper

believed that LIVERMORE was attempting to obstruct him and allow SCHMID to evade

law enforcement.  While he was detained, officers noted that LIVERMORE was again in

possession of a large amount of currency.

16.     At the same time, SCHMID exited the driver seat and attempted to evade

law enforcement by running down toward the river.  As SCHMID exited the driver's side,

she failed to put the vehicle in park and the vehicle rolled down a small embankment. Agents from the SJDDTF responded and searched the area near the river and located SCHMID hiding by the river in an attempt to conceal herself from law enforcement. SCHMID was detained on the embankment of the North Fork Gunnison River.

17.     SCHMID requested to speak with the trooper.  Agents advised SCHMID of her *Miranda* rights and then SCHMID volunteered that anything found in the vehicle belonged to her.  The trooper tried to ascertain what would be found in the vehicle, but SCHMID would not elaborate.  SCHMID was arrested and transported to Montrose County Jail.  LIVERMORE was released.  A short time later, agents observed as LIVERMORE began running away from the area even though he had been advised that he was not under arrest and was free to leave.

18.     The TARGET VEHICLE was impounded and transported to the Montrose County Sheriff's Office for safekeeping pending the approval of a search warrant.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

19.     As described above and in Attachment B, I submit that if computers are found in the TARGET VEHICLE, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

20.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have

been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

21.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online

nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

22.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used. The devices may also have fingerprints on them indicating the user of the computer and its components.

23.     Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from

a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

24.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

25.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

26.     Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As

explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

27.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

28.     For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include

the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

a.      On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

b.      On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

c.      On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

29.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

a.      The nature of the evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing

evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

      b.    <u>The volume of evidence and time required for an examination.</u>
Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.      Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces

of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times are necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachment B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential for probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation.  As with all evidence, the Government will maintain the evidence

and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

30.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching, and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31.     If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established.  The filter team will have no previous or future involvement in the investigation of this matter.  The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege.  At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys.  The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review.  If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before

providing these attorney communications to the investigative team.  If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## **CONCLUSION**

32.     Based on my training and experience, as well as all of the information obtained in this investigation, there is probable cause to believe the TARGET VEHICLE contains illegal drugs, drug proceeds, or evidence of drug distribution.  I believe, based on the information and events described above, that SCHMID and LIVERMORE are engaged in an ongoing methamphetamine distribution conspiracy and when approached by law enforcement attempted to evade law enforcement through running or barricading themselves in an effort to destroy or conceal illegal drugs.  I further believe, based on SCHMID and LIVERMORE's efforts to evade law enforcement on June 12, 2020, and SCHMID's statements, that the TARGET VEHICLE contains evidence of their ongoing drug trafficking offenses.

33.     Accordingly, I respectfully request that this Court issue a search warrant for the TARGET VEHICLE described in Attachment A to search for and seize evidence describe in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

/s/ Jason Greenfield
Jason Greenfield
Special Agent, DEA


Subscribed, attested to, and acknowledged by reliable electronic means on June ⎯⎯17⎯⎯, 2020.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Gordon P. Gallagher
United State Magistrate Judge
District of Colorado


This Affidavit was reviewed and submitted by Assistant U.S. Attorney Jeremy Chaffin.

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The TARGET VEHICLE further described as a 2003 green Jeep Liberty, with Colorado license plate CTC603, assigned Vehicle Identification Number ("VIN") 1J4GL48K23W529500, registered to Tony Duane Harris, at 1242 7745 Rd, Crawford, CO 81415, currently secured at the Montrose County Sheriff's Office impound facility.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located in the TARGET VEHICLE that constitute evidence of the commission of, the fruit of crime, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Section 924(c) ("Subject Offenses"), including the following:

1. Controlled substances, including methamphetamine.

2. Vessels or other implements used in connection with the production, packaging, weighing, storage, transport, distribution, or use of controlled substances.

3. Substances used to mix into controlled substance in order to create a larger volume.  Such substances are commonly referred to as "cut."

4. Records or information pertaining to violations of the Subject Offenses.

5. Records or information pertaining to the transfer, sale, transportation, distribution, or importation of controlled substance or the proceeds therefrom.

6. Records or information pertaining to travel facilitating, arranging, or furthering the transfer, sale, transportation, distribution, or importation of controlled substances or the proceeds therefrom.

7. United States Currency, in quantities and/or packaging consistent with drug trafficking.

8. Indicia of ownership, such as keys, lease or rental agreements, titles, registrations, or insurance records.

9. Concealed and/or aftermarket compartments which may be used to import or transport controlled substances.

10. Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms, and ammunition.

11. Records evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money which may be proceeds of the Subject Offenses.

12. Payment or financial records pertaining to violations of the Subject Offenses.

13. Photographs or videos of co-conspirators, assets, weapons or firearms, and/or controlled substances.

14. Devices used to communicate with other individuals involved in the manufacture or distribution of controlled substance, or devices used to conduct counter surveillance against law enforcement, and/or receipts or literature describing the same.

15. Records or information pertaining to the use or ownership of any electronic devices, or that aid in the identification of persons involved in violations of the Subject Offenses;

16. Records or information describing time, date, locations items or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

17. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, or other contact information of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

18. Computers, which include all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, any physical object upon which computer data can be recorded, including desktop and laptop computers, computer hardware, computer software, volatile data, cellular telephones, tablets, gaming devices, network hardware, hard disk drives, RAM, flash memory, CDs, DVDs, and other magnetic or optical storage media, as well as computer related documentation, computer passwords and data security devices, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offense(s) (collectively hereinafter, "COMPUTER").

19. For any COMPUTER or storage medium whose seizure is otherwise authorized by this warrant, and any COMPUTER or storage medium that contains or in which is stored records or information that is otherwise called for by the warrant:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to the Subject Offenses and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the Subject Offenses;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment;

n. information about usernames or any online accounts or email addresses;

o. records or correspondence, in any format and medium, pertaining to the Subject Offenses, including address books, names, lists of names, and address of individuals who may have been contacted by use of the

COMPUTER for the purpose of committing violations of the Subject Offenses;

p.  records, correspondence, photographs, or videos of or about controlled substances or firearms, or individuals possessing, obtaining, distributing, or suing controlled substances or firearms;

q.  the telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the COMPUTER;

r.  items otherwise described above in paragraphs of this Attachment B.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing or drawing); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.